147 F.3d 1182
 14 IER Cases 193, 98 Cal. Daily Op. Serv. 5496,
98 Daily Journal D.A.R. 7703
 Rosella E. BURNS; Timothy Ray Keener; Ted-Hyun Kim; Emil
Martin; Belle McGovern; Brenda L. Miotke; Keith Miotke;
William Parker; Lavern Rhodes; Orrin Savage; Larry
Vetter, Plaintiffs-Appellants,
v.
STONE FOREST INDUSTRIES, INC., Defendant-Appellee.
 No. 96-35715.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 11, 1997.
Decided July 14, 1998.
 
 Megan Glor, Swanson, Thomas & Coon, Portland, Oregon, for the plaintiffs-appellants.
 Joel H. Spitz, Ross & Hardies, Chicago, Illinois, for the defendant-appellee.
 Kary L. Moss and Lamont Satchel, Maurice and Jane Sugar Law Center, Detroit, Michigan, for amici curiae International Brotherhood of Teamsters, Laborers International Union of North America, United Electrical, Radio and Machine Workers of America, United Food and Commercial Workers Union, United Mineworkers International Union, Union of Needletrades, Industrial and Textile Employees.
 Appeal from the United States District Court, for the District of Oregon; Thomas M. Coffin, Magistrate Judge, Presiding. D.C. No. CV-95-06103-TMC.
 Before: CANBY, T.G. NELSON, and KLEINFELD, Circuit Judges.
 KLEINFELD, Circuit Judge:
 
 
 1
 The only significant issue in this case is whether employees deprived of 60 days notice of a plant closing are entitled to get paid for each of the 60 days, or for what would have been work days during the 60 days. The Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq., controls. We join most of the other circuits that have ruled on the issue in construing the statute to mean work days.
 
 FACTS
 
 2
 Because of restrictions on timber supply and rising costs, Stone Forest Industries shut down its plywood mill in Albany, Oregon. The company told the employees on September 26, 1994, that the mill would close two days later, September 28, but that they would be paid until November 26, 61 days after the notice. They could pick up their paychecks each payday at the personnel office. Even though the mill would be closed and they would not be working, they would get paid during the 61 days, measured by what they had worked before the shutdown, with benefits and vacation pay to be cashed out with their final paychecks.
 
 
 3
 The full time employees brought a class action for additional pay. Their theory was that they should get paid for each calendar day during the last 60 days, not just each work day. The magistrate judge opined that they were entitled only to be paid for the work days, and because the company had paid them fully for all work days, they were entitled to no damages for the company's failure to give them the required 60 days notice before the mill shut down. The district court accepted the magistrate judge's recommendation, and granted summary judgment to the company. The workers appeal. No party asserts that there are any issues of fact.
 
 ANALYSIS
 
 4
 Congress passed a law in 1988 saying that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice...." 29 U.S.C. § 2102(a).
 
 
 5
 The statute carefully delineates the liability of employers who violate its terms, and provides that the remedies listed are "exclusive." 29 U.S.C. § 2104(b). The remedy relevant to the case at bar is "back pay for each day of violation" "for the period of the violation":
 
 
 6
 (a) Civil actions against employers
 
 
 7
 (1) Any employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for--
 
 
 8
 (A) back pay for each day of violation at a rate of compensation not less than the higher of--
 
 
 9
 (i) the average regular rate received by such employee during the last 3 years of the employee's employment; or
 
 
 10
 (ii) the final regular rate received by such employee;
 
 
 11
 ...
 
 
 12
 Such liability shall be calculated for the period of the violation, up to a maximum of 60 days, but in no event for more than one-half the number of days the employee was employed by the employer.
 
 
 13
 29 U.S.C. § 2104(a)(1). The employer's liability is reduced by wages and other payments the employer makes to the laid off employees for the period of the violation. 29 U.S.C. § 2104(a)(2). Civil penalties of not more than $500 per day may be imposed in some circumstances, on top of the back pay. 29 U.S.C. § 2104(a)(3). This appeal does not raise any question of liability for a penalty.
 
 
 14
 There were 18 fewer work days than calendar days in the 60 day period at issue. The period included about nine weeks, spanning 17 weekend days and Thanksgiving. The company paid the workers the rate to which they would have been entitled for all work days, but not for calendar days within the 60 day period that would not have been work days. The money at stake is what the workers would have been paid, had their hourly rates applied to those 18 non-work days.
 
 
 15
 The statute makes the company liable for "back pay for each day of violation" to be "calculated for the period of the violation, up to a maximum of 60 days." The reading favorable to the company is that "back pay" means what the employees would have been paid, had the violation not occurred. The reading favorable to the workers is that "for each day of violation" and "calculated for the period of the violation" means pay for every calendar day during the period, not just every work day. Each side makes a "plain language" argument. We cannot resolve the case simply by reading the words and looking up their definitions, because a literal reading of the words and syntax of the statute allows for either reading.
 
 
 16
 One approach to this form of ambiguity is to look to legislative history. "As is often the case, the legislative history is more indeterminate in its meaning than the statute itself." United States v. Baird, 85 F.3d 450, 454 (9th Cir.1996). The Senate Report supports the work days analysis: "wages ... the employee would have received had the plant remained open." S.Rep. No. 62, 100th Cong., 1st Sess. 24 (1987). The House Report is less clear, but seems to favor the calendar days analysis: "for each day of violation, an employer is liable to each aggrieved employee for the amount paid in wages and benefits to such employee prior to the layoff." H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess. 1052 (1988), U.S. Code Cong. & Admin. News at 1547, 2085. Neither formulation was passed by both houses and was signed by the president, so neither formulation is the law. See Puerta v. United States, 121 F.3d 1338, 1344 (9th Cir.1997). It makes no sense to parse the ambiguous legislative history as though it were the law.
 
 
 17
 The preferable way to resolve linguistic ambiguity is to evaluate the alternative readings in light of the purpose of the statute. See Sacks v. Commissioner, 69 F.3d 982, 992 (9th Cir.1995). "We must examine the meaning of the words to see whether one construction makes more sense than the other as a means of attributing a rational purpose to Congress." Longview Fibre Co. v. Rasmussen, 980 F.2d 1307, 1311 (9th Cir.1992). Law is more complex and interesting than algebra, because the words are not mere symbols to be manipulated, but expressions of human purposes to be served.
 
 
 18
 The statute is a wage workers' equivalent of business interruption insurance. It protects a worker from being told on payday that the plant is closing that afternoon and his stream of income is shut off, though he has to buy groceries for his family that weekend and make a mortgage payment the next week. The name of the act is a somewhat strained attempt to come up with a good acronym, WARN, suggesting its purpose, "Worker Adjustment and Retraining Notification Act," P.L. 100-379 § 1. A worker is entitled to be warned before his plant shuts down, unless one of the statutory exceptions applies.
 
 
 19
 In line with that purpose, it makes perfect sense to require the company to pay the worker for 60 work days. That means his stream of income continues to flow for 60 days after he knows the plant will shut down, so he has two months to look for a new job, perhaps in a new town if the plant shutdown decimated employment in his town.
 
 
 20
 It does not make sense to require the company to pay him for calendar days without regard to work days, because the stream of income would be arbitrarily long for some workers and short for others. Under the calendar days approach, someone who worked 4 10-hour shifts in a week would replace a much longer stream of income than someone who worked 5 8-hour shifts per week. The 4 10s worker would get 10 hours times 60 days, 600 hours of pay. The 5 8s worker would get 8 hours times 60 days, 480 hours of pay. But that is 15 weeks of income for the 4 10s worker, 12 weeks for the 5 8s worker. The large difference is arbitrary relative to the statutory purpose. Under the work days approach, both workers get what they would have earned in the two-month notice period, were there no shutdown. That serves the statutory purpose of providing a two-month uninterrupted income stream facilitating a job search.
 
 
 21
 Another reason why the work days approach makes more sense is that the calendar days construction would put financial pressure on the company to reduce expense in a way that would hamper the workers' opportunities to search for new jobs. The company in this and any case could avoid liability by requiring the workers to come in every work day during the 60-day notice period, and telling them to sit and waste time in a plant that produced nothing. But if the company closes the plant and tells the workers to come in for their paychecks and otherwise feel free to look for work, retrain, or do as they like during the 60-day period, then under the workers' theory in this case, it has to pay them for weekends and holidays. Indeed, Stone Forest, the defendant in this case, did exactly what the more sensible alternative describes. Congress was trying to make a shutdown less painful for the workers, yet the construction urged by the workers and the amici in this case would make a shutdown more painful, by discouraging employers from letting workers use the 60-day notice period to search for new jobs. We should not choose a construction of ambiguous statutory language that would attribute irrationality to Congress, where the words also lend themselves to a sensible construction.
 
 
 22
 The work days approach is a good literal reading. The statute says that the violating company must pay "back pay" for every day of the violation period. The term "back pay" for employees has traditionally been understood to mean "a sum equal to what they normally would have earned" had the violation not occurred. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 197, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). The 4 10s worker normally would have earned compensation for about 9 weeks, 360 hours, in a 60 day period, not 600 hours. The 5 8s worker, likewise 360 hours, not 480. The "back pay" for a day that a worker would not have worked had there been no violation would be zero.
 
 
 23
 Although this is a case of first impression for us, several other circuits have decided the question raised. The Third Circuit tackled the question first, and adopted the calendar days construction favored by the workers. United Steelworkers of America v. North Star Steel Co., 5 F.3d 39, 43 (3d Cir.1993). But three other circuits, the Fifth, Sixth and Tenth, have subsequently rejected the Third Circuit's reasoning and result, and adopted the work days approach. Carpenters Dist. Council of New Orleans v. Dillard Dept. Stores, Inc., 15 F.3d 1275, 1283-85 (5th Cir.1994); Saxion v. Titan-C-Manufacturing, Inc., 86 F.3d 553, 560-61 (6th Cir.1996); Frymire v. Ampex Corp., 61 F.3d 757, 771-72 (10th Cir.1995). We agree with the critique the other circuits have made of the Third Circuit construction, and with the Tenth Circuit's observation that the legislative history "remain[s] susceptible to the same multiple interpretations" as the statutory language. Frymire, 61 F.3d at 771.
 
 
 24
 The workers argue that the district court erred in holding that the "good faith" provision of 29 U.S.C. § 2104(a)(4) applied, but we need not reach the issue, because of our conclusion on the work days or calendar days issue. The workers also argue that the district court erred in declining to exercise supplemental jurisdiction over their state law claim under the Oregon Wage Law, ORS § 652.140, but only "because the district court erred in dismissing plaintiff's WARN Act claim." Because we have held that the district court did not err in dismissing the WARN Act claim, this contention need not be considered further.
 
 
 25
 AFFIRMED.